Good morning, everyone. Our first case for argument this morning is United States v. Deandre Maxwell v. Tyrone Fulwilly. Mr. Roy. Thank you, Judge. Good morning. May it please the Court, Opposing Counsel. My name is Michael Roy on behalf of Appellant Deandre Maxwell. This Court should vacate the defendant's convictions and remand for further proceedings. I plan to focus on the arguments raised in Maxwell's briefs that the District Court applied the wrong burden of proof at the pre-Franks hearing and that it erred when it refused to consider any information about the confidential informant. However, I'm also happy to answer any questions about the pretrial proceedings in general as Maxwell did join Mr. Fulwilly's arguments about probable cause in the Franks hearing. So to start, I want to focus on the pre-Franks hearing. The standard for getting a Franks hearing, a full Franks hearing, is just a burden of production. It's really about the defendant making a proffer and then any argument about whether they actually can prove a violation is reserved for the Franks hearing itself. And here the District Court conflated the burdens of proof from the pre-Franks standard and the Franks standard, and we know that because the Court said the Franks hearing. But did the judge apply the wrong standard? What's your best evidence that the judge applied the wrong standard? I know he stated the wrong standard, no doubt, but in his written order he wrote the right standard. And I agree, it's important whether he actually applied it too. If he had just misstated it, then there would be a lot more argument that it was a brief verbal misstep, right? However, I think the biggest evidence that he also applied the wrong standard is that he repeatedly drew inferences in favor of the government instead of in favor of the defendant. And I think the big picture of the point here is it's, I mean, it's a rough analog, not a perfect analog, but I think it's sort of a rough analog to like summary judgment in a civil case in that there's multiple inferences that can be drawn from the evidence presented at the hearing. You could draw the inferences that the district court did, explain away any potential evidence from the pre-Franks hearing, but if there is also a reasonable inference in the defendant's favor that points to the possibility of a Franks violation, then that is enough to clear the hurdle and get a full Franks hearing. And in a case like this, where probable cause rises and falls with a single informant, evidence that that informant is biased or lacks credibility is enough on its own to get to the next step. Why do you say that? I was going to ask you about harmless error. Why do you say credibility of the informant? Sure. Because I think that looking at the affidavit, the rest of the information in the affidavit that, you know, goes towards probable cause, none of it on its own would be enough to support probable cause. But collectively? I mean, I think collectively, if everything from Kirk was removed from the affidavit. No, I'm not even sure that the government argues that if you remove all of Kirk's statements, that there is still probable cause. Because without Kirk, it's, even though we're arguing that Kirk's statements are still too conclusory, lacking in detail, the other evidence or statements in the affidavit are extremely conclusory. It's stuff like... If you're right on all that, do you have a good faith problem? Not for the Frank's arguments, because a Frank's violation gets past good faith. For the probable cause argument raised in Mr. Folwiley's brief, we would say we get around the good faith issue by being able to point to Bell, this Kirk's decision as Bell, as an analogous affidavit, another case that failed probable cause. Mr. Roy, on the Frank's issue itself, what's the material omission in the affidavit? It's the information that leads to either Kirk having biases or just physically not being able to observe the conduct he did. But in the affidavit itself, it states that Kirk lives near apartment 209. And the confidential informant, Kirk, then appeared in front of the issuing judge. And by appearing in front of the issuing judge was able to answer any questions the judge would have had about what living near apartment 209 means. Why isn't that enough to save the affidavit? Well, in this case, there's no evidence that he actually went under oath well before the issuing judge or testified. It just says he was there. As this court explained in Glover, without evidence that he actually testified, the assumption is he did not testify. He did swear to sign the affidavit, but there's no evidence the judge did ask any questions. I mean, it's possible, but it's just not in the record. Why would we want the judge asking questions that are not in the affidavit? Once he swore to give the information in the affidavit, that's it. Why is that not enough? Why does the judge have to ask questions that go beyond the information that's in the affidavit? The judge does not have to in every case, but it's something the judge can do to sort of bolster the affidavit. And it's a factor. One of the five factors on informant based affidavits that can increase the credibility of the informant, increase probable cause is if they not only appeared before the judge issuing judge, but also testified and answered questions. It's sort of like a belt and suspenders thing a judge can do. Yeah, he doesn't have to. No, we're not arguing the judge has to do that in every case. So I'm not sure I understand what you're saying. So if we assume that the confidential informant went with the detective to the swearing out of the search warrant, you're saying we should not further assume that the state court judge was able to answer or able to ask a question about an ambiguity in the affidavit without affirmative evidence of that? Well, I'm sure the judge was able to. I mean, the judge, of course, could have but there's no evidence that the judge did do that. Because maybe the affidavit was fine. Well, and apparently that's what the judge thought also. And this is only one of the five factors that goes towards probable cause. It's something that could elevate the affidavit if the rest of the factors fell short. But our argument is the rest of the factors fall short and that this additional factor, which could have helped the government is absent in this case or not fully there. There's corroboration in the warrant application from the interview with the property manager that bolsters what the confidential informant was saying in the affidavit, which would have given the issuing magistrate or issuing judge some confidence that there was no need to put the informant under oath, bring in a court reporter, have a testimonial warrant application as opposed to just a paper warrant application that's sworn. Typically, that's what would happen if the judge has questions that about the four corners, what's in the four corners of the warrant application being on the record proceeding and it asks questions of the officer and the informant. And I would push back a little that the property manager complains are corroboration because really all we know is a property manager said that, yes, some people complained that there might be drugs at that apartment. Frequent multiple complaints, I think. Well, we don't even know how many complaints. We know that Carpenter, the detective, talked to the property manager close in time to asking for the warrant. But we don't know when the complaints were made to the property manager. Also, this is like heavily student housing. So presumably a lot of people are on year to year leases. I mean, there were multiple people who were interviewed in this case who were tenants who had moved in in the summer, which would be expected if they're on an academic calendar. We have no idea even when these complaints were made to the property manager. We don't know what the substances of what some. I mean, I think one thing that's notable is Kirk. A big part of his was like, well, I smelled marijuana. I think they're dealing with the criminal history. Sure. I mean, that's not nothing. That's not nothing. But I think it barely moves the needle. I mean, criminal history in and of itself is not indicative of criminal activity. How that weighs in, considering the other evidence. I mean, I think it can be relevant, but it's sort of fall back to if you remove all of Kirk's statements, which is what they were challenging with the Frank's motion, saying that they have previous criminal history does not raise them to the level of probable cause. Kirk's statements in the affidavit are absolutely necessary for probable cause. Just to, again, confirm the universe of omitted information, according to your Frank's argument, it's the lack of vantage point, the informant's lack of vantage point about what was going on in the physical issue. That's that's half of it. The other half is the potential biases of it and that the investigator identified B.F. as the presumptive person who was the informant, who had another tenant said B.F. had been bragging about getting rid of tenants and threatening to do it again. He said he had did not like those tenants because of noise complaints. So there was we don't know exactly because then the district court sort of put the kibosh on putting any evidence in about B.F. or about Kirk, which dove sails into our other argument about the confidential informant disclosure. Although I see that I remember. You can say a few things about that issue. Sure. So regarding the confidential informant, obviously the ultimate decision on whether to disclose is normally abusive discretion. But in this case, I think there's two clear legal errors that require at least a do over. And this for the students is disclosing the identity of the confidential. Exactly. Yes. Yes. I apologize. I'm sorry. So the first legal error is I think the district court applies sort of a bright line rule that tipster means no disclosure. The next legal error was also assuming that it can't be relevant if he doesn't have trial relevant testimony. Both those are just legally wrong. It's a balancing test. Tipster status puts the weight on the government side or add some weight with a thumb on the scale. But it doesn't automatically mean no disclosure. Likewise, it doesn't have to be a trial witness at a Frank's hearing. It's crucial if you have evidence of bias or evidence of anything that draws into question the informant's testimony. And this court very frequently sees Frank's type claims that are all about this confidential informant has these credibility problems that weren't part of the warrant. Taylor, Clark and Glover are examples of that exact fact pattern that's just drawn from cases we were already citing in our briefs. Then I think to compound it further is even if the court had grounds to initially deny the motion to disclose and we're not even arguing that like he had to grant disclosure just that he applied the wrong legal standard when it came to the hearing itself. He should have allowed the defendants to present their own evidence that's separate than the government's privilege against disclosure does not mean that the defendants are also barred from presenting their own evidence about the informant or potential informant. And it sort of begs the question, who exactly are we protecting from learning about the informant's identity? The government knows who the informant is. The defense presumably knows who the informant is. They're trying to present that evidence. It's only the district court who doesn't know. So what exactly is the public policy benefit of preventing the defendants from telling the court? And if the issue is that the transcripts are going to get over something, there's alternatives. It could be sealing portions of the transcript. But if we're just protecting the district court from learning the informant's identity, I would presume the district court's not going to go out and do anything to the informants, right? That's not what the public policy is about. I'm happy to answer any specific questions, though, about the confidential informant. Thank you. All right. Chakran. Is that how it's pronounced? Chakran. Okay. Thank you. Good morning. May it please the court. Opposing counsel. Carly Chakran on behalf of appellant Tyrone Fulwiley. There was insufficient evidence to prove Mr. Fulwiley guilty of possession of the drugs with intent to distribute, with possession of the firearms, or with possession of the firearms and furtherance of a drug trafficking offense. What about the baggies of drugs in his bed? There, that would, the baggies of, there were bags of cocaine found in the south bedroom, but there was not a substantial connection to connect Mr. Fulwiley to the south bedroom. What about the stuff that belonged to him that was in there? The government presented two pieces of evidence that belonged to Mr. Fulwiley in the bedroom. There was a 2018 money gram, and there was a debit card on the floor. We have absolutely no idea. There was no, how long those pieces of evidence were in there. We had no evidence was presented how long those documents were in the south bedroom. And the lease? No, your honor. Does he dispute that he in the apartment? We dispute that Mr. Fulwiley lived in the apartment in 2021. There, it's unclear as to what, when Mr. Fulwiley actually may have lived in the apartment. Ms. Lori Wilson testified at trial that she had subleased the apartment to Mr. Fulwiley, but her testimony was pretty hazy as to specifically when. She said she had signed lease at the end of 2020 and within a month or two had subleased the apartment to Mr. Fulwiley. As you noted, there was no, there's no lease. There was no documentation. It was a very loose sublease agreement. Why isn't that enough for the jury with the other? Sure, your honor. You know, I mean, putting him in the apartment, start with that. Sure. So there, there's no definitive evidence putting Mr. Fulwiley in the apartment in 2021. And to prove possession of those drugs, the government had to prove that Mr. Fulwiley possessed the drugs that were found in the apartment that were seized during the search warrant on September 29th, 2021. There's absolutely no evidence of there's no testimony of testimonial evidence placing Mr. Fulwiley in the apartment. Ms. Wilson could not place Mr. Fulwiley in the apartment in September, 2021. And then the government's other witness was Daniel Walls, who was a resident at the apartment. He could not place Mr. Fulwiley in the apartment at any specific time, including in September of 2021. So the government failed to provide, prove a substantial connection between Mr. Fulwiley and that South bedroom. So then the government, the last piece of evidence the government really hangs its hat on is the DNA profile that was found on the two firearms. So after the search warrant, the execution, there was two firearms found in the apartment. One that was found in the North bedroom that belonged to Mr. Maxwell. There's no, I don't believe there's any dispute that Mr. Maxwell resided in the North bedroom. The other firearm was found under a couch cushion in the living room. The DNA profile contained Mr. Fulwiley's DNA plus three others. The government's expert at trial could not testify or could not tell us when that DNA was put on the, got onto the gun to how long the DNA had been on the gun or if the DNA was directly put on the gun. DNA, he testified that DNA could be transferred. So at most the DNA profiles on the two firearms show that some point in time, unknown point in time, Mr. Fulwiley may have touched the guns. Mere touching is not dominion and control. The government, it shows at most that he had access to the guns at some point, but it does not show that he had dominion and control. Do you have any case law support when a felon touches a firearm that the felon does not possess the firearm? Yes, your honor. United States versus Katz is instructive here. In that case, the defendant was convicted of unlawfully possessing a firearm by a felon. And in that case, the main evidence against the defendant was his fingerprints on that gun. At trial in that case, the expert testified that they could not tell how long those fingerprints had been on the gun. That's different. That's a timing issue. That doesn't say that if a felon possesses a gun, he actually doesn't possess the gun. In other words, if you're a felon and you pick up a firearm, that is a crime. I would know. I would disagree with you, your honor. In that case, this court said that the fingerprints only showed that at some point that defendant had touched that gun and that but in order to show the possession, the government had to show that the defendant had the power and intention to exercise dominion and control. And that is not what we have here. And just like in that case, the government did not prove that that defendant possessed the gun. Mere touching of a gun is not possession. It may show access, but access is not possession. Yes, your honor. That's true. Just because mere touching is not dominion and control. So, I guess we'll go by a hypothetical here. If, let's say, Mr. Fulwiley was a felon, and he had a gun in his hand, and he had a gun in his There had been evidence that presented at trial that someone had seen Mr. Fulwiley with a gun, or someone had seen Mr. Fulwiley using a gun to protect himself or protecting his drug. There was none of that. That would potentially rise the level of constructive possession. That's not what we have here. We just have the DNA profile, which we do not know how long it's on there. And also, the indictment charged Mr. Fulwiley with possession between the January 1, 2021 and September 29, 2021. But again, there's no evidence that the DNA profile was, we have no evidence as to when the DNA profile was put on the firearms. I thought one of the neighbors, this guy named Daniel Walls, testified that Fulwiley was one of the apartments, was someone who lived in the apartment. Yes, your honor. Mr. Walls did testify that Mr. Fulwiley was a resident of apartment 209, but again, he could not specifically place Mr. Fulwiley in the apartment at any specific time. Especially, he said, back in 2021. That was as much as he could say. He testified that he could not place Mr. Fulwiley in the apartment in September of 2021 or in August of 2021. The standard of review under which we're evaluating this is awfully deferential to the government side. Circumstantial evidence we know is allowed to prove each of these crimes. And we've said it's a nearly insurmountable hurdle. Yes, your honor. To beat a jury verdict on insufficiency grounds. Yes, your honor. It is a high burden, but the height of that hurdle depends directly on the strength of the government's evidence. And here, the government's evidence is thin. I'd like to save the remainder of my time for rebuttal. That's fine. Thank you. Ms. Boyle. Good morning, your honors. May it please the court, counsel. My name is Catherine Boyle on behalf of the United States. Your honor, there's a number of issues that have come up with both of my co-counsel, of both opposing counsel today. And I'd like to start with the search warrant itself. Since sort of looking at whether the search warrant affidavit had probable cause is an underlying issue for a lot of the other things going on here. If you look at the affidavit in this case, the information within the four corners of the affidavit provides ample probable cause examining the totality of the circumstances, which is the correct standard. As your honors noted earlier in speaking to opposing counsel, the correct standard here is not breaking everything apart and seeing if every individual piece itself would supply probable cause for this search warrant. The correct standard is looking at everything in the affidavit and seeing, seeing how it adds up. In this case, you have the confidential informants information, and you also have substantial corroborating information. One of the things you look at when you're evaluating a confidential informants information is level of detail and first-hand observations. Here we have detailed first-hand observations of drug trafficking. We have somebody who lived near apartment 209. Over the course of the year, they've described, they've seen two men who they described specifically in their 30s who were the only apparent residents of the apartment. The confidential informant provides information that on multiple occasions a week and often per day, he sees men conducting which would appear to be drug transactions, hand-to-hand exchanges, and observed brief visits to the apartment, which is also consistent with this sort of drug exchange. The confidential informant had smelled fresh cannabis emanating from the apartment within the prior week. Within the past six months, he saw one of the residents with a gun in the waistband and provided a description as to which resident it was. The confidential informant was able to locate the suspected drug dealer's Facebook profiles, which permitted law enforcement to check the photographs on those profiles and note the vanity names that were associated with them. The confidential informant ID'd Mr. Fulwiley and Mr. Maxwell from Illinois Secretary of State photographs. If you look at the degree of corroboration here, you also have the Crimestoppers tip. You have the property manager, as your honors noted, who said that person had received multiple complaints of drug dealing and the property manager didn't say exactly when that occurred, but she was interviewed within the week prior to the search warrant. It was quite recent. She also explained that the female lessee of the apartment was not staying there, that maintenance men had seen two black males staying in the apartment, which also fit with Mr. Fulwiley and Mr. Maxwell's description. We discussed the Rantoul, Illinois traffic stop of Ms. Wilson's car, the discovery of drugs, the potential association with the vanity names of the defendants that were later discovered via the Facebook profiles in various aliases in criminal cases, and you also have the criminal histories of the defendants themselves. They were convicted of a federal drug conspiracy in South Dakota involving the exact same drug that they were dealing again in this case. Mr. Roy makes some points about the importance of the informant in the grand scheme of the affidavit and also emphasizes that what's really important here is what does it mean to live near apartment 209 given the layout of where 209 is at within these park place apartments? How do you respond to those points that he's made that there's really without more information in that affidavit about what it means to live near that apartment given the layout, there's just really no way to say that the confidential informant Kirk was in position to see this activity. I understand your honor. First, I'd just like to step back and make a point about the general assertions about the confidential informant here in the Franks hearing which is Mr. Roy suggested that in order to examine whether the informant's statements were material here, you would have to take them out entirely, but that's not what was talked about We talked about whether adding certain items regarding the view that the confidential informant could see from their apartment would change sort of the analysis of the affidavit. In this case, as the district court noted, the district court found correctly that the confidential informant could have seen the drug transactions outside the apartment as well. So whether the confidential informant is seeing these drug transactions actually at apartment 209 or potentially outside the apartment outside the apartment building but knows that the residence conducting them live in apartment 209, both of those things here would support probable cause in the affidavit regardless of which way you interpret it. So even if you take the defendant's position into account and say this person did not live on the second floor, for instance, so their real view here was to the first floor in the door, this is also not a big apartment building. There's about eight apartments in an entirely. This is during COVID. Everybody is home. Everybody knows exactly where people live and they know if the defendants are returning to apartment 209 after conducting these hand-to-hand transactions in these very short periods. Don't you think that the information in the affidavit from the informant about living near 209, at least as conveyed to the issuing judge, were observations about what the informant saw or heard or smelled coming from 209? In other words, it's very hard for me to read that and think, well, there was drug dealing going on in the parking lot or there was drug dealing going on out back. I read what's in the affidavit as the informant saying, no, I have firsthand knowledge about what I believe was going on either in or at the doorway of apartment 209. I actually don't think it's that relevant to that analysis, whether the informant lived on the first or second floor. Just because the informant potentially lived on the first floor or lived on the second doesn't mean they couldn't see what was going on on either other floor. This was a small apartment complex with an open stairwell and I don't think that we need to, I think that even if we were to assume that the confidential informant statements were regarding what was going on in the apartment building, we would not necessarily have an issue with the exact, which one of the eight apartments or so in the building the confidential informant lived in. I think that all these observations probably could have been made by somebody living on either floor. Just to go back a little bit to the affidavit itself, the time between the events reported in the warrant application was recent as we discussed in our brief. Very importantly here, this is a confidential informant who went with Detective Carpenter before the issuing judge appeared, swore to the statements. That adds an incredible additional level of reliability to the informant statements here. As your honors noted, this is a situation where when you look at the contents of the affidavit, good faith would apply. I understand that goes to the Frank's as well here, of course, because you wouldn't have good faith apply if there was something included that was in reckless disregard for the truth. But the district court didn't err here, clearly or otherwise, in denying the defendant's motion for a Frank's hearing. The defendant simply did not make a substantial preliminary showing that the warrant application contained material omissions that would alter the issuing judge's probable cause determination and that those facts were admitted intentionally or with reckless disregard for the truth. They cite Mr. Moody's testimony and interviews with apartment building residents and say that what he discovered would have raised questions about the confidential informant's reliability and credibility and altered the probable cause analysis. The allegations, as your honor noted, are that only one apartment had a direct line of sight to the front door and no first floor apartment had a direct line of sight to the second floor and that only one apartment resident suspected drug dealing activity. But even if, as the district court found, even if you include all that information in the affidavit and make the suggested excisions, you're still going to have probable cause because when you look at the affidavit with those changes, you have multiple tenants complained to property management regarding suspected drug activities at apartment 209. You have one tenant also complained about noise from that apartment. Maintenance workers confirmed that two men, rather than the named tenant, were residing at the apartment. A Rantoul Police Department investigation connected those residents to the aliases Ben Franklin and Sox and the Facebook profiles with those same aliases matched photographs and other identifying information for the defendants. Kirk observed a suspected drug activity outside the apartment by two men. Kirk knew his apartment 209's tenants. Kirk detected the fresh scent of cannabis in the week prior to the execution of the warrant, before the warrant's issuance, and Mr. Fulwiley and Mr. Maxwell were previously convicted. If you put all those things together, that takes into account every suggested change that the defendants mentioned below, you would still have an affidavit that supplied probable cause in this case. There's also no evidence here that any purported facts were omitted intentionally or recklessly, and there's no evidence that the confidential informant's identity would have changed the calculus. It's simply not material in this case. Regarding the potential viewing of drug transactions outside or at apartment 209 itself, or at the threshold of apartment 209, the issuing judge for the search warrant could draw reasonable inferences that the men were dealing drugs where they lived. One point I wanted to make that I think is important here is, I think, first of all, we have a situation where, admittedly, there was a verbal slip at the pre-Frank's hearing in terms of what the legal standard was, but that's something the district court corrected in both of its written orders on this case. The district court used the correct standard. And one of the other criticisms the defendants make here of the district court in an effort to show why, potentially, these rulings were incorrect, is they criticized whether the district court could look at all at how likely something was to happen. And I think an interesting analogy here would be how an issuing judge might evaluate a probable cause analysis. That issuing judge, in evaluating whether there's probable cause or something, does not have to refrain from considering whether it is vastly more likely that another possibility would occur. And so, too, here, in looking at the pre-Frank's analysis, the judge is permitted to think about a relative likelihood when they're evaluating the substantial preliminary showing. Turning quickly to informant identity, the district court here acted well within its discretion in upholding the government's privilege to withhold the identity of its confidential informant. Although the defendants claim in this case that the district court just applied a bright line rule and confined its analysis to whether the informant was a mere tipster or was a transactional witness, that's not the case. It is true that the district court said that the informant, correctly said that the informant was a mere tipster, but the district court also said that the defendants hadn't established a need for the identity in light of that, and that's true here. There's no need to have the confidential informant's identity in this case. And that's important because we, as a society generally, we want to encourage individuals to report crimes to law enforcement, and one of the ways we can do that is by not necessarily, is by creating sort of a presumption, subject to exceptions, that they, their identity will not necessarily be revealed for doing so in a situation where they're a mere tipster and they're not involved in the transaction. Looking at the sufficiency of the evidence, ample evidence supported the jury's determination that Mr. Fulwiley was guilty of all three counts. As your honors noted, the standard here is viewing the evidence in the most favorable light to the government, whether any rational juror could find that the defendant was guilty of these crimes. In terms of the defendant's drug possession, which could be constructive here, it is clear that there was sufficient evidence for a reasonable juror to find that the defendant possessed these drugs. As your honors noted, there was, there was cocaine in the defendant's bathroom, the south bathroom, and it's important to think about the layout of the apartment here. The south bathroom and the south bedroom were sort of their own suite in the apartment, so when you have this cocaine in the vanity bathroom drawer and you have Mr. Fulwiley's identification documents in the bedroom, you have evidence from Mr. Walls that Mr. Fulwiley is still living in the air, in the apartment. You have evidence that he's been paying cash rent to Ms. Wilson since late 2020, and through the warrants execution, he's paid up. There's, there's plenty here for a rational juror to draw the inference that, A, Mr. Fulwiley lives in the apartment, B, he is a full participant in the drug dealing that's going on in the apartment. For the same reason, we believe there's sufficient evidence of the gun possession. Mr. Fulwiley's DNA was on both guns. As to the gun's specific locations, we would dispute that these guns weren't readily accessible. These guns appeared to be placed just to be readily accessible near to where a lot of the drug dealing was going on. If you look at the layout of the apartment again, one of the guns was in the north bedroom and one of the guns was in the living area under a cushion. Both of these are very close to the door of the apartment where somebody would potentially come in if there were to be a robbery, and they are also very close to the kitchen of the apartment, which is where a lot of the drugs were stored. In fact, the biggest amount of drugs in the paint container that was over 40,000. For the same reasons, when you combine all the evidence on the 922G and the 841 counts, you can also see that these guns were clearly used in the in furtherance of drug trafficking. This is a situation where the apartment was essentially awash in drugs. There were drugs in basically almost every room, and the guns were readily accessible. As the government's expert testified, these were a tool of the drug trade, and you can see from the evidence presented in this case that there was sufficient evidence on the 924C count as well. Thank you, Your Honors. If you have no further questions, we'll rest on the arguments in our brief and ask that the Court affirm. Thank you. Mr. Boyd? Well, your time, but you can have an extra minute and rebuttal. All right. Thank you, Judge. I want to use my rebuttal time to quickly go back to a question Judge Kirsch asked at the beginning about what evidence there was of the District Court actually applying the wrong standards in the Franks ruling. It's, I think, the clearest examples of him drawing the inferences in the appendix in response to the defense's evidence that other tenants in the building had been interviewed, had not seen similar activity to Kirk. The Court's response was, well, they just moved in about a month or so before the warrant was sought. Maybe they're too new to know everything. Perfectly reasonable inference. However, an equally reasonable inference is that they didn't see it because Kirk lied or exaggerated. And at the pre-Frank stage, the Court should have been drawing the inference in the defense's favor, not in the government's favor. I think the other best example is on page 110, sort of in response to the general materiality issue, saying Kirk saw a jarred activity outside the apartment building. That's a possible inference that that could have happened, but it doesn't say in the affidavit that he saw. That's drawing an inference in the government's favor. I'd also point at the top of page 110, where the District Court is referring to how the issuing judge can draw reasonable inferences about evidence in the government's favor. Definitely true for an issuing judge, not true for the District Court when they're deciding a Frank's motion. Contrary to government, I do not think that an issuing judge's analysis of probable cause is analogous. Rather, it's whether the evidence as a whole at the pre-Frank's hearing suggests the reasonable possibility of a violation. Unless there's any further questions, I'll sit down. Thank you. Ms. Shelgren, anything further? Yes, briefly. The evidence showed that Mr. Maxwell was dealing drugs from this apartment, and Mr. Maxwell was using firearms in furtherance of a drug trafficking offense. Again, there was no evidence tying Mr. Fulwile to the drugs that were found in the apartment on September 29, 2021, to the guns, and there was even less evidence tying the firearms to the drug trafficking offense under 924C. The government had mentioned that there was evidence that Mr. Fulwile was paying rent through the time of the search warrant. That's not what the evidence showed. Ms. Wilson testified that she had only collected a couple months of rent, and that was at the very beginning. There was no evidence showing that Mr. Fulwile was still leasing the apartment through the time of the search warrant. So, we would ask that this court vacate and reverse Mr. Fulwile's convictions. Thank you. Thanks to all counsel. We'll take the case under advisement. Move to our second case this morning. Alan Braid v. Oscar Stille.